# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2016AP21 |
| COMPLETE TITLE: | Metropolitan Associates,<br>            Plaintiff-Appellant-Petitioner,<br>     v.<br>City of Milwaukee,<br>            Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 373 Wis. 2d 310, 895 N.W.2d 104
(2017 – Unpublished)

| | |
|---|---|
| OPINION FILED: | January 10, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 15, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Jeffrey A. Conen and Dennis P. Moroney |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | R.G. BRADLEY, J. and KELLY, J. (co-author)dissent (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Alan Marcuvitz*, *Nicholas J. Boerke*, and *Von Briesen & Roper*, *S.C.*, Milwaukee. There was an oral argument by *Nicholas J. Boerke* and *Alan Marcuvitz.*

For the defendant-respondent, there was a brief filed by *Grant F. Langley,* city attorney, and *Allison N. Flanagan,* assistant city attorney. There was an oral argument by *Allison N. Flanagan.*

An amicus curiae brief was filed on behalf of League of Wisconsin Municipalities by *Claire Silverman* and *League of Wisconsin Municipalities*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP21
(L.C. No. 2009CV9871)

STATE OF WISCONSIN        :        IN SUPREME COURT

**Metropolitan Associates,**

      **Plaintiff-Appellant-Petitioner,**

  v.

**City of Milwaukee,**

      **Defendant-Respondent.**

**FILED**

**JAN 10, 2018**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1    ANN WALSH BRADLEY, J.  The petitioner, Metropolitan Associates (Metropolitan), seeks review of an unpublished court of appeals decision affirming the circuit court's determination, which in turn affirmed the City of Milwaukee's (the City) tax assessment of property owned by Metropolitan.[1]  Metropolitan contends that the court of appeals erred in concluding that the

---

[1] Metro. Assocs. v. City of Milwaukee, No. 2016AP21, unpublished slip op., (Wis. Ct. App. Dec. 8, 2016) (affirming order of circuit court for Milwaukee County, Jeffrey A. Conen and Dennis P. Moroney, JJ.).

City complied with Wis. Stat. § 70.32(1) (2013-14)[2] in its assessment of Metropolitan's property.

¶2 Specifically, Metropolitan argues that the City contravened Wis. Stat. § 70.32(1) because it failed to utilize the "best information" available when it relied on mass appraisal, and not single-property appraisal, in determining the value of Metropolitan's property. Metropolitan additionally asks this court to reject the findings of the circuit court regarding the reliability of the competing assessment evidence and the weight and credibility the circuit court attributed to that evidence. Ultimately, it argues that the application of the presumption of correctness to the City's assessment based on a mass appraisal constitutes an error of law.

¶3 We conclude that the City's assessment of Metropolitan's property complied with Wis. Stat. § 70.32(1). The City permissibly utilized mass appraisal for its initial assessment and appropriately defended its initial assessment with single property appraisals demonstrating that the assessment was not excessive.

¶4 Next, we decline Metropolitan's request to upset the circuit court's findings of fact. As the court of appeals aptly stated, "[i]n asking us to reject the court's judgment as to the weight and credibility of the competing assessment evidence, Metropolitan effectively asks us to substitute our judgment for

---

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

the circuit court's regarding the credibility of witnesses and the relative weights to assign to various pieces of the evidence at trial, neither of which we can do."[3]

¶5 We conclude that the circuit court's findings of fact regarding the reliability of the respective appraisals are not clearly erroneous. Because the circuit court's findings are sufficient to support its determination regardless of whether the presumption of correctness was employed, we need not address whether the presumption of correctness attached to the assessment based on the initial mass appraisal.

¶6 Accordingly, we affirm the decision of the court of appeals.

I

¶7 The facts presented arise from the City's assessments of seven properties owned by Metropolitan for the tax years 2008-2013. Metropolitan objected that the assessments were excessive, initially appealing to the City's Board of Assessors and Board of Review. The Board of Assessors and Board of Review both upheld the assessments. Metropolitan then brought an excessive assessment action in the circuit court.

¶8 Both parties agreed to present evidence on only one of the seven Metropolitan properties, the Southgate Apartments, and to focus exclusively on the tax years 2008-2011. They further agreed that the resolution of the Southgate Apartments

---

[3] *Metro. Assocs. v. City of Milwaukee*, No. 2016AP21, unpublished slip op., ¶35 (Wis. Ct. App. Dec. 8, 2016).

assessment would control the resolution of Metropolitan's challenges to the other six properties' assessments.

¶9 The Southgate Apartments were initially assessed by the City using a "mass appraisal" technique. At trial, the City assessor, Peter Weissenfluh, testified that "[m]ass appraisal is a technique used by probably the majority of assessment jurisdictions in the nation. It is a process whereby an assessor values entire groups of property using systematic techniques and allowing for statistical testing."

¶10 Mass appraisal stands in contrast to single property appraisal. Weissenfluh testified that single property appraisal "is looking at the individual properties and determining the full fair market value of that individual property with more detail and more . . . individual analysis . . . ."

¶11 Single property appraisals are conducted by what Weissenfluh described as a "three-tier valuation technique." The three "tiers" of analysis provide a hierarchy of what constitutes the best evidence of fair market value. Pursuant to a "tier 1" analysis, the best evidence of value is a recent sale of the subject property.

¶12 Weissenfluh explained that there were no recent sales of the Southgate Apartments. Because no tier 1 evidence was available, he then moved to a "tier 2" analysis, also known as a "sales comparison" approach.

¶13 A tier 2 analysis examines any sales of reasonably comparable property. Under this approach, as Weissenfluh testified, an assessor "surveys the market to determine

4

comparable sales. In that process many sources are used." The assessor then selects comparable properties relying on such factors as location and use, adjusting the sale price based on particular physical characteristics of the properties.

¶14 Weissenfluh testified that he completed a tier 2 analysis to assess the Southgate Apartments. Through this analysis, he ultimately arrived at a value higher than that produced with the initial mass appraisal.

¶15 If there is no information from which to conduct either a tier 1 or tier 2 analysis, the assessor moves to a "tier 3" analysis. A tier 3 analysis takes into account other characteristics of the property, such as the amount of income it generates and the cost to maintain it.

¶16 Weissenfluh conducted a tier 3 income analysis "to confirm that the sales comparison approach made sense." He further testified that his income analysis validated the results of the sales comparison analysis, confirming that the initial mass appraisal was not excessive.

¶17 Metropolitan responded by presenting the testimony of its appraiser, Lawrence Nicholson. He also conducted both tier 2 and tier 3 analyses of the Southgate Apartments. Nicholson concluded, contrary to Weissenfluh's determination, that the Southgate Apartments had a value lower than that reflected in the City's initial mass appraisal.

¶18 After a two-day bench trial, the circuit court rendered a written decision affirming the City's initial assessments. The circuit court determined first that the City

5

complied with Wis. Stat. § 70.32(1) and the Wisconsin Property Assessment Manual (the Manual) by conducting a mass appraisal of the Southgate Apartments.

¶19 Second, the circuit court found that the City's tier 2 and 3 valuations were "more reliable" than Metropolitan's. Specifically, the circuit court determined that "[t]he City's sales comparison approach is more reliable than Metropolitan's approach" because Metropolitan made "adjustments based solely on the properties' net operating income[]." In so doing, Metropolitan "conflate[d] the sales comparison and income approaches."

¶20 Further, the circuit court found that "[t]he City's income approach was more reliable than Metropolitan's approach." The City's income approach correctly adjusted for Metropolitan's expense ratio, which was "markedly higher than the expense ratios for similar properties in the market." As the circuit court highlighted, "[t]he market trend is to maintain a lower expense ratio, and the City's income approach accounted for this."

¶21 On appeal, Metropolitan argued that the circuit court erred in concluding that Metropolitan failed to rebut the presumption of correctness to which City assessments are entitled. Specifically, it asserted that (1) the City's initial assessments were invalid as a matter of law because the City assessor used the mass appraisal method and not the three-tier technique; (2) the City assessor's tier 2 and 3 assessments were conducted in a manner contrary to Wisconsin assessment law in

that the City assessor ignored the individual economic characteristics of the Southgate Apartments property; and (3) the circuit court erred in its determination that the City assessor's methods were more reliable than those of Metropolitan's assessor.

¶22 The court of appeals rejected Metropolitan's arguments. It concluded that the Wisconsin Property Assessment Manual explicitly encourages assessors to use mass appraisal. Metro. Assocs. v. City of Milwaukee, No. 2016AP21, unpublished slip op., ¶20 (Wis. Ct. App. Dec. 8, 2016). Next, it determined that the City assessor's sales comparison and income analyses were conducted in accordance with Wisconsin law. Id., ¶33. Finally, it opined that the circuit court's determination regarding the reliability of each assessor's methods was a credibility determination that the court of appeals would not upset on appeal. Id., ¶35.

II

¶23 In this case we are asked to review a tax assessment made in an action for refund of excess property taxes paid pursuant to Wis. Stat. § 74.37(3)(d).[4] An action under § 74.37

---

[4] Wis. Stat. § 74.37(3)(d) provides:

If the taxation district or county disallows the claim, the claimant may commence an action in circuit court to recover the amount of the claim not allowed. The action shall be commenced within 90 days after the claimant receives notice by registered or certified mail that the claim is disallowed.

is a new trial, not a certiorari action. Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶6, 315 Wis. 2d 791, 762 N.W.2d 841. Accordingly, we review the circuit court's determination, not that of the assessor or Board of Review. Id.

¶24 In review, we interpret and apply Wis. Stat. § 70.32 to determine whether the appraisal at issue followed the statutory directives. Regency W. Apartments LLC v. City of Racine, 2016 WI 99, ¶22, 372 Wis. 2d 282, 888 N.W.2d 611. Statutory interpretation and application present questions of law that this court reviews independently of the determinations rendered by the circuit court and court of appeals. Id.

¶25 We do, however, defer to a circuit court's findings of fact. Royster-Clark, Inc. v. Olsen's Mill, Inc., 2006 WI 46, ¶11, 290 Wis. 2d 264, 271, 714 N.W.2d 530, 534 (citation omitted). Factual findings made by the circuit court will not be disturbed unless they are clearly erroneous. Emp'rs Ins. of Wausau v. Jackson, 190 Wis. 2d 597, 613, 527 N.W.2d 681 (1995). It is within the province of the factfinder to determine the weight and credibility of expert witnesses' opinions. Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶6, 351 Wis. 2d 439, 839 N.W.2d 893 (citation omitted).

### III

¶26 Metropolitan argues first that the City's assessments do not comply with Wis. Stat. § 70.32(1), which provides in relevant part:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain . . .

Specifically, Metropolitan contends that the City did not use the "best information" available when it relied on mass appraisal rather than single property appraisal. The argument centers on the meaning of "best information that the assessor can practicably obtain."

¶27  In its initial briefing,[5] Metropolitan asserts that the "best information" on which to base an assessment is not that which informs a mass appraisal, but instead is information underlying a single property appraisal pursuant to the three tiers of analysis under State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 173 N.W.2d 627 (1970).

¶28  Wisconsin Stat. § 70.32(1) explicitly directs that property be assessed "in the manner specified in the Wisconsin property assessment manual." The Manual provides that "[c]ommercial property can be valued by either single property or mass appraisal techniques." 1 Wisconsin Property Assessment Manual (2009) at 9-5.[6]

---

[5] Although in its initial brief Metropolitan appeared to cast aspersions on mass appraisal as a whole, it conceded in its reply brief and at oral argument that it is not asking the court to "completely discard mass appraisal techniques." Metropolitan thus recognized that the information underlying a mass appraisal may constitute the best information available at the initial assessment stage. See Pet'r Reply Brief at 2.

[6] All references to the Wisconsin Property Assessment Manual are to the 2009 version unless otherwise noted.

9

¶29 "Mass appraisal is the systematic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing." 1 Wisconsin Property Assessment Manual at 7-32. The Manual provides for assessors utilizing mass appraisal in initial assessments: "Mass appraisal is the underlying principle that Wisconsin assessors should be using to value properties in their respective jurisdictions." Id.

¶30 Mass appraisal stands in contrast to single property appraisal, which is the valuation of a single particular property as of a given date. Id. A single property appraisal focuses on the unique characteristics of the subject property within the strictures of the methodology set forth in Markarian, 45 Wis. 2d 683.

¶31 In Markarian, we addressed a landowner's challenge to the City of Cudahy's assessment of his property. 45 Wis. 2d at 684. We interpreted Wis. Stat. § 70.32(1)[7] to set forth a hierarchical valuation methodology for single-property appraisal. Id. at 686. The text of the statute lists three sources of information in a specific order, with the court in

---

[7] Wis. Stat. § 70.32(1), as relevant here, provides:

In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

Markarian clarifying this order as indicative of the quality of the information each source provides. Id. This methodology has been further described in the courts as providing for three "tiers" of analysis. See, e.g., Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶¶20-30, 317 Wis. 2d 228, 767 N.W.2d 567.

¶32 The best information of a property's fair market value is an arm's-length sale of the subject property. Markarian, 45 Wis. 2d at 686; Regency W., 372 Wis. 2d 282, ¶27. Examination of a recent arm's-length sale is known as a "tier 1" analysis. Allright Props., 317 Wis. 2d 228, ¶21.

¶33 If there is no recent sale of the subject property, the appraiser moves to tier 2, examining recent, arm's-length sales of reasonably comparable properties (the "sales comparison approach"). Markarian, 45 Wis. 2d at 686; Allright Props., 317 Wis. 2d 228, ¶22.

¶34 When both tier 1 and tier 2 are unavailable, an assessor then moves to tier 3. See Allright Props., 317 Wis. 2d 228, ¶29. Under tier 3, an assessor "may consider 'all the factors collectively which have a bearing on value of the property in order to determine its fair market value.'" Adams Outdoor Advert., Ltd., v. City of Madison, 2006 WI 104, ¶35, 294 Wis. 2d 441, 717 N.W.2d 803 (quoting Markarian, 45 Wis. 2d at 686). These factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the

11

owner." State ex rel. Mitchell Aero, Inc. v. Bd. of Review of City of Milwaukee, 74 Wis. 2d 268, 278, 246 N.W.2d 521 (1976) (citations omitted). Both the income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, fit under the umbrella of tier 3 analysis. Adams Outdoor Advert., 294 Wis. 2d 441, ¶35.

¶35 Metropolitan's argument that the "best information" must necessarily be the information underlying a single property appraisal and not a mass appraisal is unpersuasive for two reasons. First, property must be assessed "in the manner specified in the Wisconsin property assessment manual." Wis. Stat. § 70.32(1). It allows assessors to conduct mass appraisal. 1 Wisconsin Property Assessment Manual at 7-32. Second, Metropolitan's argument does not give full effect to the word "practicably" in § 70.32(1).

¶36 The Manual outlines the division of labor between mass appraisal and single property appraisal, demonstrating when the use of each method is appropriate:

> The assessor needs skills in both mass appraisal and single property appraisal. Mass appraisal skills for producing initial values, whether during a reappraisal year or not, and single property appraisal skills to defend specific property values or to value special-purpose properties that do not lend themselves to mass appraisal techniques.

1 Wisconsin Property Assessment Manual at 7-32.

¶37 Metropolitan acknowledged in its reply brief and at oral argument that mass appraisal is appropriate in certain

circumstances. Namely, Metropolitan recognized that at the initial assessment stage, mass appraisal may comprise the best information for all properties being assessed en masse.

¶38 The Manual makes clear that mass appraisal is accepted at the initial assessment stage. It likewise sets forth when a single property appraisal is warranted. A single-property appraisal is necessary (1) after the initial mass appraisal has been challenged by the taxpayer or (2) if the property being valued is a "special-purpose" property that does not lend itself well to mass appraisal.[8] See 1 Wisconsin Property Assessment Manual at 7-32. The express language of the Manual indicates that mass appraisal is a proper method of valuation in all other circumstances.

¶39 Requiring a single property appraisal after a taxpayer challenges an assessment does not mean that the value of the property must be set in accordance with the single property appraisal. Indeed, this could not be the case when the subsequent single property appraisal is higher than the initial mass appraisal. In Trailwood Ventures, the court of appeals determined that Wis. Stat. §§ 74.37 and 74.39[9] do not permit the

---

[8] There has been no argument advanced here that the Southgate Apartments are a "special-purpose" property. Accordingly, we will not address the second exception to the general rule in favor of mass appraisal.

[9] Wisconsin Stat. § 74.37 sets forth rules and procedures for excessive assessment actions. Wis. Stat. § 74.39 permits a court to order reassessment of a property if it is deemed necessary. Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶8, 315 Wis. 2d 791, 762 N.W.2d 841.

court to impose a greater tax burden than the one the taxpayer challenges. 315 Wis. 2d 791, ¶10.

¶40 The question on appeal in a Wis. Stat. § 74.37 action is not whether the initial assessment was incorrect, but whether it was excessive. Accordingly, Weissenfluh testified at trial as follows:

> Q: And you're not asking that the assessment be changed to the sales comparison approach value, correct?
>
> A: No. The assessment cannot be changed at this level. All I'm showing is that my work supports the original assessment and I conclude, therefore, that the assessment as made was not excessive.

The value reflected in the initial mass appraisal can thus constitute the value of the property for tax assessment purposes as long as it is not excessive.

¶41 Further, disallowing mass appraisal as the basis for the City's valuation in this case would not give full effect to the word "practicably" in Wis. Stat. § 70.32(1). Wisconsin Stat. § 70.32(1) dictates that an assessment must be based on "the best information that the assessor can practicably obtain" (emphasis added).

¶42 "[S]tatutes should be so construed that no word or clause shall be rendered surplusage." Milwaukee Cty. v. Dep't of Indus., Labor & Human Relations Comm'n, 80 Wis. 2d 445, 452-53, 259 N.W.2d 118 (1977) (quoting Cook v. Indus. Comm'n, 31 Wis. 2d 232, 240, 142 N.W.2d 827 (1966)). A blanket disavowal of mass appraisal would render the word "practicably"

superfluous. It would not be practicable to require a single property appraisal of every parcel in the state.

¶43 Completing annual assessments in a major metropolitan area would simply not be feasible without the use of mass appraisal. As Weissenfluh testified at trial, "[i]n Milwaukee we have 150,000 properties. Without mass appraisal it's a job that simply could not be done [] especially on an annual basis."[10]

¶44 Mass appraisal is equitable and efficient. 1 Wisconsin Property Assessment Manual at 7-32. Additionally, mass appraisal is widely used throughout the country. See,

---

[10] The dissent recognizes that assessing every single property in the City of Milwaukee every year is "at the very least, a daunting prospect," but would nevertheless mandate that the task be completed. Dissent, ¶97. However, it appears to rest on the flawed assumptions that the information needed to conduct a single property appraisal is both reliable and ("practicably") available in all instances. This is problematic for two reasons.

First, the dissent assumes that the City should trust the data submitted by Metropolitan, which the circuit court specifically determined was not reliable. Second, it assumes that the information necessary to conduct a tier 2 valuation was available to the City because it brought such a valuation to trial and because Metropolitan provided it with information to conduct such an analysis. Id. To say that the City can practicably obtain the information because Metropolitan gave it to them is to accept without scrutiny the data provided by a self-interested party. Importantly, we observe that the City brought a tier 2 valuation to trial solely to defend its mass appraisal. It was forced to compile the information necessary to conduct a tier 2 analysis only because Metropolitan challenged the initial mass appraisal. As Weissenfluh testified, it would not be practicable for the City to do this for every property, every year.

15

e.g., C.P. & Son, Inc. v. Bd. of Cty. Comm'rs of Cty. of Boulder, 953 P.2d 1303, 1304-05 (Colo. App. 1998); Walsh v. State Prop. Tax Appeal Bd., 677 N.E.2d 489, 493 (Ill. App. Ct. 1997); In re Johnson Cty. Appraiser/Privitera Realty Holdings, 283 P.3d 823, 828 (Kan. Ct. App. 2012); Revenue Cabinet, Com. of Ky. v. Gillig, 957 S.W.2d 206, 209 (Ky. 1997); Darnall Ranch, Inc. v. Banner Cty. Bd. of Equalization, 753 N.W.2d 819, 827 (Neb. 2008); Appeal of Wagstaff, 255 S.E.2d 754, 756 (N.C. Ct. App. 1979); Gray v. Wyoming State Bd. of Equalization, 896 P.2d 1347, 1349 (Wyo. 1995). While our conclusion is not dependent on the practices in other jurisdictions, an examination of such practices demonstrates that our approach in endorsing mass appraisal does not make Wisconsin an outlier.

¶45 At the initial assessment stage, the best information the City can "practicably" obtain is often that underlying a mass appraisal. Because its use is provided for by the Manual and it allows the City to efficiently assess a large number of properties, mass appraisal comports with Wis. Stat. § 70.32(1). We thus reaffirm that mass appraisal is appropriately utilized as a manner of valuing property under § 70.32(1).

¶46 Although subject to modification, the Manual sets forth the procedures to be used. Wisconsin Stat. § 70.32(1) directs the use of the Manual. The value reflected in the initial mass appraisal can constitute the value of the property for tax assessment purposes as long as it is not excessive.

16

¶47 Our recent decision in Regency W., 372 Wis. 2d 282, does not alter this conclusion. In Regency W., we determined that the City of Racine:

> chose not to employ [] information [regarding projected expenses and income] and chose instead to calculate the [net operating income] for its income-based valuation through mass appraisal techniques that were not particularized to Regency West's property. We conclude that in that regard, Racine did not comply with the directive of § 70.32(1) because it did not use the "best information" that was available to its assessor.

Id., ¶40. Regency W. can be fairly read to hold that mass appraisal valuations are legally valid so long as the underlying characteristics are appropriately particular to the property in question. In Regency W., the assessor refused to use expense data for the federally regulated subject property, relying instead on expenses for market rate properties that did not share the underlying characteristics. Id., ¶¶40, 46.

¶48 We therefore conclude that the City's assessment of the Southgate Apartments complied with Wis. Stat. § 70.32(1). The City permissibly utilized mass appraisal to value the property and appropriately defended its initial assessment with single property appraisals demonstrating that the mass appraisal was not excessive.

IV

¶49 Metropolitan contends next that the circuit court erred in concluding that Metropolitan failed to rebut the presumption of correctness to which City assessments are entitled. It asserts that we should reject the circuit court's

17

findings regarding the reliability of the competing assessment evidence and the weight and credibility the circuit court attributed to that evidence. Metropolitan also argues that the presumption of correctness should not have attached to the City's assessment in the first instance.

¶50 Wisconsin Stat. § 70.49(2) provides that a tax assessment being challenged pursuant to Wis. Stat. § 74.37 is entitled to a presumption that it was "justly and equitably" made, giving rise to a presumption of correctness.[11] Bonstores Realty One, 351 Wis. 2d 439, ¶¶5, 7; Adams Outdoor Advert., 294 Wis. 2d 441, ¶25. The presumption can be overcome if the challenging party presents significant contrary evidence. See Adams Outdoor Advert., 294 Wis. 2d 441, ¶25.

¶51 Metropolitan advances that it presented significant contrary evidence sufficient to rebut the presumption of correctness. At trial, both the City and Metropolitan presented the testimony of their respective appraisers. The City, in defending its initial mass appraisal, presented the testimony of City assessor Peter Weissenfluh. Metropolitan presented the testimony of its own appraiser, Lawrence Nicholson.

---

[11] Wisconsin Stat. § 70.49(2) provides:

The value of all real and personal property entered into the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other.

18

¶52 We turn first to the parties' respective tier 2 sales comparison analyses. In defending the initial mass appraisal, Weissenfluh conducted a tier 2 sales comparison analysis of the Southgate Apartments. Nicholson likewise provided a tier 2 sales comparison analysis.

¶53 A sales comparison analysis involves "a comparison of properties similar to the subject property and adjustment for differences." Walgreen Co. v. City of Madison, 2008 WI 80, ¶22, 311 Wis. 2d 158, 752 N.W.2d 687 (internal citations omitted). "The Manual explains that this approach incorporates 'the principles of substitution,' that buyers will not pay more for property than it would cost them to acquire substitute property of equal desirability and utility." Id.

¶54 Under the sales comparison approach, the Manual directs that a property's operating expenses, lease terms, management quality or tenant mix "should be considered." 1 Wisconsin Property Assessment Manual at 7-21. The circuit court observed that the City did not, and should have, adjusted for economic characteristics in its sales comparison analysis. However, the City mitigated this deficiency because the valuations reached through the City's income approach supported the valuations reached under the sales comparison approach.

¶55 Metropolitan, however, made adjustments to its own appraisal based only on the properties' net operating income without consideration of any other factors. In so doing, the circuit court determined that Metropolitan "conflate[d] the sales comparison and income approaches."

¶56 It is error to use the income approach "when the market value is established by a fair sale of the property in question or like property." Markarian, 45 Wis. 2d at 686. The income approach should only be used when there is no data of comparable property on which to base a sales comparison analysis. Id.

¶57 Accordingly, the circuit court opined that, by relying only on income, "Metropolitan [had] not presented reliable contrary evidence to support its sales comparison valuations." As a result, the circuit court found that "[t]he City's sales comparison approach is more reliable than Metropolitan's approach."

¶58 Next, we turn to the parties' tier 3 analyses. The record reflects that Weissenfluh conducted a tier 3 income analysis,[12] as did Nicholson. Pursuant to a tier 3 income analysis, a property's value is determined by reference to its income generating potential. Walgreen Co., 311 Wis. 2d 158, ¶24. In applying the income approach, "the assessor must be aware of what is happening in the market. All of the information needed for the income approach is either obtained or

---

[12] Weissenfluh performed an appraisal using the tier 3 income approach, even though under the Markarian framework it was not required. See Walgreen Co. v. City of Madison, 2008 WI 80, ¶73, 311 Wis. 2d 158, 752 N.W.2d 687 (explaining that the income approach is only favored over the sales comparison approach if there is no available data of comparable properties). He used this approach to validate the results of his earlier sales comparison approach.

verified by what the assessor finds in the marketplace." Id. (citing Wisconsin Property Assessment Manual (2007) at 9-11).

¶59 As it did with the sales comparison approach, the circuit court found that "[t]he City's income approach was more reliable than Metropolitan's approach." Metropolitan's income approach relied too heavily on Metropolitan's own expense ratio, which is markedly higher than the expense ratios for similar properties. Further, the specific expenses that were responsible for the heightened expense ratio were largely administrative and payroll expenses. The circuit court determined that these expenses are "not tied to the property itself."[13]

¶60 Conversely, the City accounted for the market trend with regard to expense ratio, imputing a lower expense ratio to Metropolitan that was more in line with the market. See 1 Wisconsin Property Assessment Manual at 9-12. As the circuit court stated, "[t]he market trend is to maintain a lower expense ratio, and the City's income approach accounted for this." Because the City took the market into consideration and Metropolitan did not, the circuit court found that "[t]he City's income approach was more reliable than Metropolitan's approach."

---

[13] Although we affirm on the basis that the circuit court's fact finding was not clearly erroneous, we also observe that its position finds support in the law: "[A]n assessor must have the ability to discount, even disregard, factors that do not really bear on the value of a property." Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶53, 294 Wis. 2d 441, 717 N.W.2d 803.

¶61 When the circuit court assessed the weight to be given to the testimony of each witness, it determined that Weissenfluh's appraisals were more reliable than Nicholson's.[14] The weight to be given testimony is for the trier of fact. Syvock v. State, 61 Wis. 2d 411, 414, 213 N.W.2d 11 (1973). "When the trial court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and of the weight to be given to each witness's testimony." Lessor v. Wangelin, 221 Wis. 2d 659, 665, 586 N.W.2d 1 (Ct. App. 1998).

¶62 We will upset a finding of fact only if it is clearly erroneous. Id. at 665-66. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. State v. Arias, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748 (quoting State v. Sykes, 2005 WI 48, ¶21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277 (quoting State v. Tomlinson, 2002 WI 91, ¶36, 254 Wis. 2d 502, 648 N.W.2d 367)).

¶63 The circuit court's observation that the City's approach was worthy of greater weight than Metropolitan's was not clearly erroneous. It detailed the findings of each assessor and noted what it determined to be deficiencies in

---

[14] The dissent asserts that the circuit court's only two findings of fact of import are (1) that the City's tier 2 analysis was missing an adjustment for economic characteristics, and (2) that Metropolitan's tier 2 analysis erroneously adjusted for net operating income. Dissent, ¶90. This formulation disregards and fails to give effect to the circuit court's most important finding: that the City's appraisals were "more reliable" and therefore worthy of greater weight than Metropolitan's.

Nicholson's approach. The circuit court's findings were not "against the great weight and clear preponderance of the evidence." Rather, the findings supported the circuit court's conclusion to uphold the City's assessment.

¶64 Metropolitan additionally argues that the presumption of correctness should not have attached to the City's assessment in the first instance. In support of this argument, it also advances that, by presenting evidence of its tier 2 and 3 analyses, the City demonstrated that its own assessment was incorrect.[15] Because we have concluded above that the circuit

---

[15] Specifically, Metropolitan contends that the City cannot rely on a presumption of correctness because the only evidence it presented (Weissenfluh's tier 2 and 3 analyses) indicated that the initial appraisal was too low. Therefore, the tier 2 and 3 analyses undermine the correctness of the initial mass appraisal and should not be considered.

This argument is premised on footnote 19 from Regency W., 2016 WI 99, ¶57 n.19, 372 Wis. 2d 282, 888 N.W.2d 611. However, footnote 19 does not compel this conclusion. Footnote 19 states:

> We do not consider the appraisals of Peter Weissenfluh and Dan Furdek because their appraisals exceeded the valuations of Racine for both 2012 and 2013. See Trailwood Ventures, LLC v. Vill. of Kronenwetter, 2009 WI App 18, ¶¶12-13, 315 Wis. 2d 791, 762 N.W.2d 841 (concluding that a taxation district that has accepted the payment it requested has agreed that its taxation value is the maximum value that it may seek; Wis. Stat. § 74.37 permits a refund to the taxpayer or may uphold the status quo, but there is no authority for deficiency judgments).

Regency W. Apartments LLC v. City of Racine, 2016 WI 99, ¶57 n.19, 372 Wis. 2d 282, 888 N.W.2d 611.

(continued)

23

court's findings of fact regarding the reliability of the respective appraisals are not clearly erroneous and sufficiently support the circuit court's determination, regardless of whether the presumption was employed, we need not address whether the presumption of correctness attached to the City's assessment which was based on a mass appraisal.

¶65 In conclusion, we determine that the City's assessment of the Southgate Apartments complied with Wis. Stat. § 70.32(1). The City permissibly utilized mass appraisal for its initial assessment and appropriately defended its initial assessment with single property appraisals demonstrating that the

---

Although we do not address the question of whether the presumption of correctness applies to the City's assessment based on the initial mass appraisal, we nevertheless consider it prudent to address this argument to provide guidance to the bar on the application of footnote 19.

The court in Regency W. did not address the portions of the Manual related to the use of mass appraisal as a means for setting an initial assessment and single property appraisal to defend initial assessments. Indeed, Regency West's property, as explained above, did not lend itself well to mass appraisal. See supra, ¶47.

Metropolitan's reading of footnote 19 conflicts with the directive from Wis. Stat. § 70.32(1) that property be assessed in accordance with the Manual. The Manual dictates that a mass appraisal, if challenged, be defended with a single property appraisal. To accept Metropolitan's interpretation of footnote 19 would mean that an assessor would be unable to defend an assessment if the value he or she derived in a single property appraisal exceeded the initial mass appraisal assessment. This would lead to an absurd result. Ultimately, the question when a taxpayer challenges an initial assessment is not whether the initial assessment was incorrect, but whether it was excessive. See Wis. Stat. § 74.37(1).

24

assessment was not excessive.   Further, we decline Metropolitan's request to upset the circuit court's findings of fact because we conclude that they are not clearly erroneous.

¶66 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶67 REBECCA GRASSL BRADLEY, J. and DANIEL KELLY, J. (*dissenting*). The law requires that real property tax assessments match as closely as possible the amount a buyer would pay for the subject property in an arm's-length transaction. Our statutes provide spare, but critical, instructions on how municipalities must make that match. Most significantly, they unmistakably require that an assessment reflect the property's fair market value:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, <u>at the full value which could ordinarily be obtained therefor at private sale</u>.[1]

Wis. Stat. § 70.32(1) (emphasis added).[2] This statute also details the three types of analyses an appraiser may use in arriving at that value:

> In determining the value, the assessor shall consider [1] recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; [2] recent arm's-length sales of reasonably comparable property; and [3] all factors that, according to

---

[1] "Fair market value or full value of property is consistently defined as: '[T]he amount it will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy.'" <u>Darcel, Inc. v. City of Manitowoc Bd. of Review</u>, 137 Wis. 2d 623, 628, 405 N.W.2d 344 (1987) (quoting <u>State ex rel. Mitchell Aero, Inc. v. Bd. of Review</u>, 74 Wis. 2d 268, 277, 246 N.W.2d 521 (1976)).

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

professionally acceptable appraisal practices, affect the value of the property to be assessed.[3]

Id. A property's assessment normally enjoys a presumption of correctness under Wis. Stat. § 70.49. The presumption, however, attaches only if the appraiser used the proper valuation techniques. See State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970) (stating that the presumption of correctness "presuppose[s] the method of evaluation is in accordance with the statutes"); see also Regency W. Apartments LLC v. City of Racine, 2016 WI 99, ¶52, 372 Wis. 2d 282, 888 N.W.2d 611 ("Taxing authorities are required to comply with the law when valuing properties, and failing to do so negates the presumption of correctness that Wis. Stat. § 70.49 otherwise accords.").

¶68 The assessment in this case was not based on any of the three types of analyses listed in the statute. Instead, the

---

[3] The third type of appraisal encompasses a number of factors:

> Within tier three, an assessor may consider "all the factors collectively which have a bearing on value of the property in order to determine its fair market value." These factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner." The income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework.

Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶35, 294 Wis. 2d 441, 717 N.W.2d 803 (citations omitted).

2

City's assessor used a technique known as "mass appraisal" to determine the taxes Metropolitan must pay.  Thus, we must determine whether our statutes allow appraisers to use the mass appraisal technique, and whether the result produced by that technique reflects the fair market value of Metropolitan's property.  As discussed below, this technique is not authorized by statute, and it is structurally incapable of identifying the fair market value of a specific property.  Therefore, because the assessed value under consideration was the product of the mass appraisal technique, it is not entitled to the presumption of correctness.

¶69 The majority opinion, however, not only erroneously authorizes the mass appraisal technique, but also avoids entirely the question of whether the presumption of correctness attaches——an important task because the circuit court's decision depended upon the presumption:  "Metropolitan has not overcome the presumption of the assessments' correctness and therefore cannot prevail."  We write separately to explain why the mass appraisal technique is not authorized by Wis. Stat. § 70.32(1), and why its use constitutes an error of law.  We also analyze whether the City's or Metropolitan's single-property sales comparison assessments can be used as the basis to calculate Metropolitan's tax liability.  Based on the circuit court's findings that both the City's and Metropolitan's sales comparison appraisals are based on flawed information, we conclude that neither single-property assessment complied with the statute; therefore, this case should be reversed and

remanded for the circuit court to remand to the Board of Review to remand to the assessor with directions to perform a statutorily-compliant sales comparison analysis to determine the fair market value of Southgate using the best information available.

### I. MASS APPRAISALS

¶70 The majority says our law authorizes the mass appraisal technique for two reasons. First, the Wisconsin Property Assessment Manual (the "Manual") discusses the method, and encourages its use. Second, it says mass appraisal is the only practical means of assessing all the properties in Milwaukee every year. Neither of these reasons finds support in the laws of our State. In fact, they say the opposite.

### A. The Manual's Authority

¶71 The majority should have paid more attention to whether the mass appraisal technique is authorized by law. It touched this question so lightly, however, that it missed the legislatively-prescribed relationship between the statutes, the Department of Revenue, and this court in developing and curating the Manual's contents. As a consequence, this court found authority for the mass appraisal technique where there was none.

¶72 The majority opinion assumes, *sotto voce*, that the legislature entrusted the Manual's content entirely to the Department of Revenue, and that whatever the Department puts in the Manual comprises a proper method of appraisal. The majority observed, and truly so, that "property must be assessed 'in the manner specified in the Wisconsin property assessment manual.'"

4

Majority op., ¶35 (quoting Wis. Stat. § 70.32). But the observation is pregnant with this question: What techniques may the Manual prescribe? If the majority had engaged that subject, it would have found two substantive constraints on its content that make the mass appraisal technique ineligible for inclusion.

¶73 The first constraint relates to the very purpose for developing the Manual. The Manual is supposed to help an assessor develop a statutorily-compliant appraisal. And the sole purpose of that appraisal is to fulfill the directive that "[r]eal property shall be valued . . . at the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1). Thus, when the statute directs the assessor to appraise the property "in the manner specified in the Wisconsin property assessment manual," it presupposes that the Manual fixes its sights on the specific property's fair market value. So we view the Manual's authority in light of its ability to achieve that objective.

¶74 The legislature delegated responsibility to the Department to develop the Manual, but the Manual exists only to fulfill the statute's goal. If the Manual contains a technique that does not produce the "full value which could ordinarily be obtained therefor at private sale," then the technique lies outside the legislative mandate. Without a legislative pedigree, such a technique would necessarily lack authority. This court has said so before. In Metropolitan Holding Co. v. Board of Review, 173 Wis. 2d 626, 495 N.W.2d 314 (1993), this court rejected one of the Manual's prescriptions for precisely

5

this reason. The court concluded the Manual's direction would not fulfill the statute's requirement that the appraisal determine a property's fair market value: "In summary, we hold that the assessment of [the property] violated sec. 70.32(1), Stats. even though the assessment was pursuant to the instructions set forth in the Wisconsin Property Assessment Manual." Metropolitan Holding Co., 173 Wis. 2d at 633. That is to say, the Manual's prescriptions are authoritative only to the extent they assist in discovering a property's fair market value.

¶75 The second constraint on the Manual is that it must conform to our decisions, not vice-versa. That is not judicial hubris, it is an explicit legislative requirement. The statute authorizing the Manual's creation says it "shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information considered valuable to local assessors by the department." Wis. Stat. § 73.03(2a) (emphasis added). Thus, if some part of the Manual conflicts with our decisions, we are duty bound to ignore it. See Allright Prop., Inc. v. City of Milwaukee, 2009 WI App 46, ¶10, 317 Wis. 2d 228, 767 N.W.2d 567. As we said in Metropolitan Holding Company, the "Manual conform[s] to, rather than establish[es], Wisconsin Law." Metropolitan Holding Co., 173 Wis. 2d at 633.

¶76 It is within this context that we should consider whether the assessor may rely on the mass appraisal technique to

6

determine a property's fair market value.  As relevant to this case, an appraisal can lose its authoritative bona fides, notwithstanding the Manual's blessing, in two ways.  First, by using an appraisal method that finds no warrant in the law.  Or second, by using a statutorily-compliant appraisal method that nonetheless incorporates elements that prevent it from producing the property's fair market value.

### B.  The Mass Appraisal Technique Cannot Discover Fair Market Value

¶77  The mass appraisal technique did not identify the fair market value of Metropolitan's property.  And it did not because it could not.  We know this because the City said so.  Well, more than just said so——the City asseverated that the mass appraisal technique does not even attempt to achieve the statute's prime directive, to wit, discovering the fair market value of the subject property:

> At the outset, mass appraisal and single-property appraisal are two different valuation techniques. According to the WPAM,[] "Mass appraisal is the systematic appraisal of groups of properties, as of a given date, using standardized procedures and statistical testing.  In sharp contrast, single property or "fee" appraisal is the valuation of one particular property as of a given date."

(Emphasis added.)

¶78 "Sharp contrast," indeed.  The statute requires the assessor to identify the value of a specific property, whereas the existential purpose of the mass appraisal technique is to avoid that task.  This technique values groups of properties and, as the City admits, appraisers necessarily derive the value of a group from trends and statistics, not individualized

7

considerations: "Mass appraisal, unlike single property appraisal, requires the development of a valuation model capable of replicating the forces of supply and demand over a large area." Buyers and sellers, of course, do not settle on a price based on what the forces of supply and demand say about properties not under contract. They consult the fair market value of the specific property that is the subject of the transaction. The mass appraisal technique is simply not designed to discover that information. So if the assessed value of Metropolitan's property were to match its fair market value, it would be nothing more than a happy coincidence. The prospect of a happy coincidence does not receive the presumption of correctness.

¶79 This is the reason this court rejected the appraisal in Metropolitan Holding Company. There, the City's assessor used a capitalization of income approach to determine a property's value. Metropolitan Holding Co., 173 Wis. 2d at 629. But instead of using the property's actual income as the basis of his calculations, he used a hypothetical income derived from a market survey. Id. The resulting opinion of value, therefore, could not describe the subject property's fair market value; it could describe only the value of a chimeric property comprising both real and fictional elements. Id. at 631-32. This court said that was a violation of Wis. Stat. § 70.32(1) because the opinion failed to reflect the fair market value of the subject property. Id. at 632.

¶80 The mass appraisal technique represents the extension and formalization of the very error that caused us to reject the appraisal in Metropolitan Holding Company. Whereas there the appraiser valued a chimera (which was bad enough), the mass appraisal technique here values an entirely fictional property (which is worse). Thus, this methodology is statutorily deficient because it is structurally incapable of determining the fair market value of the specific property under consideration.

C. Mass Appraisal Is Not an Authorized Technique

¶81 The mass appraisal technique is also deficient because it is a valuation method that does not fit within the Markarian trilogy. For good or for ill, we have developed a rigid three-tier hierarchy of appraisal methodologies, and we require assessors to comply with it punctiliously. See Adams Outdoor Adver. Ltd. v. City of Madison, 2006 WI 104, ¶34, 294 Wis. 2d 441, 717 N.W.2d 803. The first tier, and the one we consider the best evidence of fair market value, is a recent arm's-length sale of the subject property.[4] The second tier inquires into recent arm's-length sales of properties comparable to the subject property (while making adjustments for differences

---

[4] "We conclude that an arms-length sale price is the best indicator to determine fair market value for property tax purposes." Darcel, Inc., 137 Wis. 2d at 624.

9

capable of affecting a property's value).[5] The third tier includes techniques such as capitalization of income and replacement cost.[6] Id., ¶¶34-35.

¶82 The hierarchy is rigid because we believe that an appraisal method's ability to accurately reflect a property's fair market value decreases as one descends through the tiers.[7] Consequently, if there is a sale of the subject property that can be used in the tier-one valuation method, we have said it is an error of law to use a different method: "We conclude that the fair market value was established by this sale [of the subject property] and that other evidence tending to show what market value might be, which might be resorted to in the absence of such a sale, may not be used here to overthrow the evidence of the market itself." State ex rel. Evansville Mercantile Ass'n v. City of Evansville, 1 Wis. 2d 40, 45, 82 N.W.2d 899 (1957); Darcel, Inc. v. City of Manitowoc Bd. of Review, 137

---

[5] "The 'best information' of such value is a sale of the property or if there has been no such sale then sales of reasonably comparable property." State ex rel. Geipel v. City of Milwaukee, 68 Wis. 2d 726, 733, 229 N.W.2d 585 (1975) (citation omitted).

[6] "The income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework." Adams Outdoor Advert., Ltd., 294 Wis. 2d 441, ¶35 (citations omitted) (referring to tier-three appraisals).

[7] Whether that belief is warranted is a matter of some debate. Wisconsin Stat. § 70.32(1) does not describe these three categories as a hierarchy, but instead as a conjunctive list of considerations for which an appraiser must account in developing an opinion of value.

Wis. 2d 623, 624, 405 N.W.2d 344 (1987) ("We conclude that . . . an approach that considers factors extrinsic to the arms-length sale [of the subject property] is not statutorily correct and therefore in error as a matter of law.").

¶83 Likewise, if there are comparable sales sufficient to conduct a tier-two analysis, it is an error of law to instead use a tier-three methodology:

> The "best information" of such value is a sale of the property or if there has been no such sale then sales of reasonably comparable property. In the absence of such sales, the assessor may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. However, it is error to use this method when the market value is established by a fair sale of the property in question or like property.

State ex rel. Geipel v. City of Milwaukee, 68 Wis. 2d 726, 733, 229 N.W.2d 585, 588-89 (1975) (citation and internal marks omitted); see also Adams Outdoor Advert., Ltd., 294 Wis. 2d 441, ¶37 ("If there were reasonably comparable sales, but the City used the income approach, the assessments would be invalid."); State ex rel. Hennessey v. City of Milwaukee, 241 Wis. 548, 553, 6 N.W.2d 718 (1942) ("When [fair market] value is established by the sale of the instant and like property there is no occasion to resort to reproduction value less depreciation as was here done to determine that value."); State ex rel. Enter. Realty Co. v. Swiderski, 269 Wis. 642, 645, 70 N.W.2d 34 (1955) (stating that "facts [supporting tier-three analysis] only indicate what the fair market value is and there is no occasion to resort to them, and it is wrong to do so, when the market value is

11

established by a fair sale of the property in question or like property.").

¶84 And finally, we have consistently rejected valuation methodologies that do not find a home in this three-tiered hierarchy. See, e.g., State ex rel. Nw. Mut. Life Ins. Co. v. Weiher, 177 Wis. 445, 448, 188 N.W. 598 (1922) (rejecting valuation based on a property's "intrinsic value," rather than its sale value); State ex rel. Markarian, 45 Wis. 2d 683 (rejecting valuation based on predicted post-development value, rather than on comparable sales); State ex rel. Lincoln Fireproof Warehouse Co. v. Bd. of Review, 60 Wis. 2d 84, 98, 208 N.W.2d 380 (1973) (rejecting valuation based on the property's "intrinsic value.").

¶85 So now we must compare the mass appraisal technique to our stable of authorized methodologies. At trial, the City admitted this method does not belong in that stable. It is neither fish nor fowl, as the saying goes, but a pastiche of various methodologies:

> Q  So let me ask you this question. Did the mass appraisal technique that was followed in 2008 contain a cost approach?
>
> [City Assessor:]  For this particular property?
>
> Q  Yes.
>
> [City Assessor:]  No.
>
> Q  Did it contain a comparable sales analysis?
>
> [City Assessor:]  Not in the strict form and the methodology that I have done in this report or that Mr. Tsoris had done for the board of review.
>
> Q  Did it follow the income approach?

> [City Assessor:]    There were elements of the income approach again with reference to the market and sales. So I would say it's a combination of information from the market developed into a process that is systematic and allowable for statistical testing.

¶86 Unless we abandon the Markarian trilogy, we must necessarily conclude that the mass appraisal technique is not lawful.  It does not reflect a recent arm's-length sale of the subject property, so it cannot be considered a tier-one method. And although it apparently resembles the comparable sales method (tier two), it does not follow its "strict form and methodology."  That must certainly be true, inasmuch as it incorporates elements of a tier-three method (income capitalization).  And finally, it incorporates factors entirely exogenous to the Markarian trilogy by relying on the value of groups of properties determined through the use of "standardized procedures and statistical testing."

¶87 The mass appraisal technique may be efficient, but efficiency is not the standard by which we measure its compliance with statutory requirements and our opinions.  This valuation method is not designed to discover the fair market value of Metropolitan's property, and it operates entirely outside the universe of previously approved appraisal techniques.  Today, the majority unwisely places this court's imprimatur on the City's appraisal methodology by making the Markarian trilogy a tetralogy.  The new addition will not rest comfortably with the others, because the mass appraisal technique is not trying to accomplish the same objective as the others.

13

## II. SALES COMPARISON EVALUATIONS

¶88 Having concluded that mass appraisal is not authorized by statute and not entitled to the presumption of correctness, we are left with determining whether either of the single-property sales comparison assessments in the record satisfied Wis. Stat. § 70.32(1).

¶89 "Failure to make an assessment on the statutory basis is an error of law." Adams Outdoor Adver., Ltd., 294 Wis. 2d 441, ¶26. "Whether the City followed the statute in making its assessment is a question of statutory interpretation that we review de novo." Id. A circuit court's findings of facts will not be overturned unless clearly erroneous. Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶6, 351 Wis. 2d 439, 839 N.W.2d 893.

¶90 There are two findings of fact of importance here: (1) the circuit court found that the City's sales comparison was erroneously missing an adjustment for economic characteristics; and (2) the circuit court found Metropolitan's sales comparison

14

erroneously adjusted for net operating income (NOI).[8]   These findings, which are not clearly erroneous, make both the City's and Metropolitan's sales comparison evaluations materially deficient because neither complies with the requirements of a proper sales comparison analysis.

¶91  Because no recent sale of Southgate exists, the proper assessment must be based on the sale price of comparable properties, with adjustments to reach a value the subject property would likely fetch if it were sold.   There is no dispute that comparable properties exist; thus, the "tier two" approach provides the best method to determine fair value.

¶92  The Manual defines comparable sales under the "Sales Comparison Approach" as:   "properties that are similar to the subject property in age, condition, use, type of construction, location,    design,    physical    features    and    economic

---

[8] The majority hangs its hat on a circuit court "finding" that the City's appraisals were "more reliable" and claims the circuit court gave more "weight" to the City assessor's testimony.   Majority op., ¶¶4-5, ¶61 & n.14.   The circuit court's reference to "more reliable" was not, however, a finding of fact.   Rather, it was a conclusion of law based on two findings:  (1) Metropolitan's assessor used NOI to make economic adjustments to its sales comparison appraisal, and (2) even though the City's sales comparison assessment failed to adjust for economic characteristics, the City's tier-three assessment supports its tier-two assessment.   The circuit court's decision never uses the term "weight" or discusses the "credibility" of the assessor's testimony.   Instead, the circuit court concludes the City's sales comparison assessment complies with the statute and Metropolitan's does not.    The circuit court's legal conclusion was wrong and mischaracterizing it as a credibility determination does not redeem the error.   Neither the City's nor Metropolitan's sales comparison assessments comply with the statute.

characteristics."  1 <u>Property Assessment Manual</u>, ch. 7, at 7-20 (2009).  The Manual then provides a list of six "Elements of Comparison":

1. Real property rights conveyed

2. Financing terms

3. Time (market conditions)

4. Location

5. Physical characteristics (e.g. size, construction quality, age, condition, features)

6. Economic characteristics (e.g. <u>operating expenses</u>, lease terms, <u>management</u>, and tenant mix).

<u>Manual</u> at 7-21 (emphasis added).  The City did not make any adjustments for economic characteristics, claiming none were necessary.  Metropolitan's appraiser made adjustments for economic characteristics, but based the adjustment on NOI instead of "operating expenses, lease terms, management, and tenant mix."  Both resulted in evaluations contrary to the statutory requirements.

¶93 With respect to the City's failure to adjust for economic characteristics, the circuit court explicitly found that "the City did not make specific adjustments for economic characteristics" and "[i]t should have."  Nevertheless, the circuit court proceeded to choose the City's assessment as more reliable because its tier-three income evaluation vouched for the numbers in its sales comparison.  But this court interpreted the statutory language to mean we cannot use the income approach unless no comparable sales exist, and everyone agrees that comparable sales do exist.  <u>Adams Outdoor Adver., Ltd.</u>, 294

Wis. 2d 441, ¶34 ("Only if there has been no arms-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies."). Using the income approach to prop up the City's flawed sales comparison approach improperly conflates the two approaches. The circuit court's finding that the City "failed to but should have" adjusted its sales comparison evaluation for economic characteristics renders the City's sales comparison approach violative of the statute. Therefore, the City's sales comparison approach cannot be used.

¶94 Next, we consider whether Metropolitan's sales comparison evaluation can be used. The circuit court found that Metropolitan's sales comparison analysis does not comply with the statute because although Metropolitan adjusted for economic characteristics, it chose to adjust for NOI instead of the factors the Manual identifies as part of the economic characteristics adjustment: "operating expenses, lease terms, management, and tenant mix." Manual at 7-21. Quoting from The Appraisal of Real Estate 300 (13th Ed.), Metropolitan's appraiser explained why he adjusted for NOI instead of making an adjustment solely on the factors listed in the Manual: "Buyers of income-producing properties usually concentrate on a property's economic characteristics and put more emphasis on conclusions of the Income Capitalization Approach." He further explained that large apartment complexes are purchased "for their income streams" and therefore considering "the comparables' respective economics relative to the subject's" was

17

important. Even if we agreed that NOI constitutes the best adjustment factor in ascertaining true fair market value, Wisconsin law does not list NOI as an element of comparison in conducting the sales comparison approach. Thus, Metropolitan's appraisal cannot be used in determining the correct assessment.[9]

---

[9] It should not be a surprise that independent appraisers, who rely on the Manual to determine fair value, produce reports contrary to the statute because the Manual contains instructions that conflict with the assessment statute. For example, the Manual does not require the same strict three-tier progressive Markarian hierarchy courts follow. Instead, the Manual instructs that all methods for which information exists should be conducted and then the final value of the property determined by a "reconciliation" of all the methods. Manual, 7-18, 7-19 ("The appraisal process consists of . . . developing preliminary values based on the three approaches to value, then reconciling the results to determine the most probable market value."; "The appraiser should consider all three approaches when estimating the value of a property."; "Reconciliation is the process by which the appraiser evaluates and selects from the alternative approaches to value."). The Manual also specifically instructs that the income approach is most commonly used in determining the value of commercial property, including apartment complexes having more than four units, because this is the information a buyer (or investor) most often uses to determine purchase price. Manual, 7-20; 9-6 ("Appraisers typically use the income approach for income-producing properties" because "buyers and sellers of income-producing property may place the most reliance on the income approach because it explicitly considers the net income of the property."; "Buyers and sellers of commercial properties usually base their transaction decisions on the property's net operating income."). These principles may explain why the income approach appears first in Metropolitan's appraiser's report. Although this may accurately reflect how appraisers normally arrive at an opinion of value, it does conflict with the court's current understanding that the statute maintains a rigid separation between the valuation methods, and requires a hierarchical prioritization amongst them. So, as it currently stands, the Manual's principles on this subject are at odds with the court's requirement that assessors use the "tier two" approach when comparable properties exist. When the Manual conflicts with our interpretation of the statute, our interpretation controls.

18

¶95 With no statutorily-compliant assessment from either party, this case should be remanded to the circuit court to remand to the Board of Review to remand to the assessor with directions to conduct a proper assessment under the sales comparison approach with an adjustment for economic characteristics using the best information available to determine the fair market value of Southgate.

### III.  PRACTICALITY

¶96 A brief word on practicality.  The majority says that "[t]he arguments center on the meaning of 'best information that the assessor can practicably obtain.'"  Majority op., ¶26 (quoting Wis. Stat. § 70.32(1)).  That is certainly where one of the parties wanted to center the argument, and full marks to the City for successfully getting this court to focus our attention there.  But this case has nothing to do with what information "the assessor can practicably obtain."  It is about what the assessor does with the information indisputably available to him.

¶97 All of the information necessary to perform a tier-two valuation of Metropolitan's property was "practicably" available to the City.  We know this because the City brought just such a valuation to trial (and Metropolitan willingly provided the underlying data year after year).  What the majority opinion really means to say is not that the information for a tier-two analysis is not practicably available to the assessor, but that the time to do an authorized analysis is not practicably available to him.  That may certainly be true:  He must assess

19

every single property in the City of Milwaukee every single year. That is, at the very least, a daunting prospect. But if he does not have enough time to do that, he needs either more staff or an amendment to the requirement that he make yearly assessments.[10] Neither of those needs, however, is capable of changing the meaning of the statute.[11]

---

[10] This is true, of course, only if the City wishes us to presume its assessment is correct. The City has two available options. It may either (a) receive the presumption of correctness by performing a statutorily-compliant appraisal, or (b) forego the presumption of correctness and perform a mass appraisal. What it may not do is ask for the presumption of correctness after performing an appraisal that does not comply with the law.

[11] In footnote 10, the majority objects to following the law set forth in the statute because: (1) it would have to trust data Metropolitan——a self-interested party——submitted; and (2) the best information is available only because Metropolitan challenged the mass appraisal, which forced the City to do the calculation the statute requires. The first objection is so sweeping that it calls into question a City's ability to ever conduct a tier-two appraisal of a commercial property (because it incorporates data in the hands only of the property owner), or a tier-three capitalization of income appraisal (because almost all of the information is solely in the owner's possession). The possibility certainly exists that a taxpayer may commit fraud by falsifying its income and costs, but that possibility does not alleviate the City's responsibility to follow the statute.

(continued)

20

¶98 So, after today, our instruction to assessors will be as follows. You must determine the fair market value from a recent arm's-length sale of the subject property, if such a transaction is available. If you do not, you err as a matter of law. If such a sale is not available, you must base the property's value on the sale of comparable properties. If you do not, you err as a matter of law. If there are not enough comparable sales to perform the analysis, then you must apply a tier-three analysis, such as capitalization of income, or replacement cost. If you do not, you err as a matter of law. All of this we will require of you without fail. Unless, of course, you don't have enough time. In that case, you can set aside the <u>Markarian</u> hierarchy, ignore our opinions, forget the statutory mandate to determine the fair market value of the subject property, and do whatever the Manual tells you to do. It seems odd that our entire jurisprudence on this subject

---

Moreover, the City chose to "trust" Metropolitan's actual rents but not its actual costs. Instead, the City used data from other apartment owners who voluntarily provide this information in response to annual surveys the City conducts. The same possibility of falsified data arises from the use of this data. In fact, as indicated on several of the City's exhibits, the City has to fabricate some of this data in order to calculate the average "market" expense ratio: "City of Milwaukee imputed 5% management fee to comparables #2, #3 and #4" presumably because those properties did not report any costs tied to management, and "City of Milwaukee appraiser imputed reserves for replacements at 3% of EGI."

The majority's second objection is also not persuasive. The City has not been forced to do anything by Metropolitan. The statute and our opinions describe what comprises a compliant appraisal, so if there has been any forcing, it was coming from the legislature and the court, not Metropolitan.

21

depends on whether the assessor has enough time, but there you have it.

¶99 Having said all this, petitioners should be wary of what they ask for. A successful challenge to the lawful basis of an assessment does not mean that the case gets remanded for a renewed contest over its excessiveness. It goes back for a new assessment. State ex rel. Boostrom v. Bd. of Review, 42 Wis. 2d 149, 156, 166 N.W.2d 184 (1969). And that means the petitioner will not enjoy the assurance that the assessment cannot increase.

## IV. CONCLUSION

¶100 Mass appraisal is not a statutorily-authorized appraisal method because it is a creation of the Manual, not the legislature, and it cannot produce "the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1). It is not entitled to the benefit of the presumption of correctness. Setting the mass appraisal aside, we are left with the parties' single-property, sales comparison appraisals. Neither complied with § 70.32(1). This case should be reversed and remanded for the circuit court to remand to the Board of Review to remand to the assessor with directions to conduct a statutorily-compliant assessment based on the sales comparison approach and properly adjusted for economic characteristics using the best information available.

¶101 For these reasons, we respectfully dissent.